**SO ORDERED.**

**SIGNED this 05 day of October, 2011.**



_____
**ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

DESIGNATED FOR ON-LINE PUBLICATION
BUT NOT PRINT PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| 1 ASHBURY COURT PARTNERS, L.L.C., | ) | Case No. 11-10131 |
| | ) | Chapter 11 |
| Debtor. | ) | |

**CORRECTED ORDER DENYING CONFIRMATION**
**OF DEBTOR'S MODIFIED SECOND AMENDED PLAN OF**
**REORGANIZATION DATED JULY 11, 2011**

The debtor, 1 Ashbury Court Partners, L.L.C., (Debtor) operates a 116-unit apartment complex at 1940 S. Woodlawn in Wichita, Kansas, that is now known as Siena Court Apartments (formerly Ashbury Court Apartments). The present ownership purchased the apartments in November of 2008 and borrowed the $2.4 million purchase money from Wells Fargo Bank (WFB). WFB acted as an originator and servicer for the Federal National Mortgage Association, commonly

-1-

known as Fannie Mae. When Debtor defaulted on its loan obligations in the summer of 2010, Fannie Mae foreclosed, triggering this bankruptcy filing on January 24, 2011. The Debtor filed a series of chapter 11 plans. The third amended plan is before the Court and provides for a cure of its default and the reinstatement of Fannie Mae's loan.[1] A trial on Fannie Mae's objection to the confirmation of this plan was held on August 25, 2011. The Debtor failed to bear its burden of proof on confirmation and, accordingly, confirmation must be DENIED.

*Facts*

In the go-go financing days of 2007-2008, Ross Meyeraan and his West Coast partners were looking for apartment opportunities in the Midwest. After scouring the Wichita, Kansas City, and Tulsa markets, they settled on acquiring what is currently the Siena Court apartments from MAACO Properties, a company controlled by Lew McGinnis. Assured by the information they received from McGinnis that this property could be profitably run and concluding that rent conditions were improving in Wichita, Meyeraan and his group, RTD Investments I, L.L.C. (RTD), secured financing from Fannie Mae through Wells Fargo. They were short about $725,000 to close the loan and needed additional capital. The group successfully raised another $400,000, but still needed $325,000 which Mr. McGinnis was willing to lend so long as he retained the right to manage the property. Armed with the necessary closing funds, Debtor and RTD closed the $2.4 million loan and purchase in late 2008.[2]

Meyeraan returned to San Francisco, leaving McGinnis in charge. McGinnis ran the

---

[1] Dkt. 129, Modified Second Amended Plan of Reorganization dated July 11, 2011.

[2] RTD became the majority interest holder and managing member of Debtor, the borrower under the loan documents. Meyeraan is the managing member of RTD.

property into the ground. He provided no reporting to the owners and the condition of the property deteriorated. After a series of mishaps, including an arson incident in the fall of 2009 that damaged 20 units of the complex, Meyeraan and his partners raised an additional $400,000 to take McGinnis out in early 2010. When RTD replaced McGinnis's management with PIMCO (Property Investors Management Company) in January 2010, RTD found that appliances were missing, tenants were not paying rents, and it appeared that McGinnis had commingled rents from a number of his properties, paying mortgage payments for one property with rents from another. PIMCO discovered that it was only 52 per cent occupied, not 82 per cent as McGinnis had represented. Deferred maintenance mounted as cash flow dried up and, by June of 2010, Debtor could not maintain its debt service to Fannie Mae.

Through its property manager, Debtor requested forbearance and, in a June 29, 2010 letter from WFB – now Fannie Mae's servicer – that can only be described as cryptic, was granted the right to defer the June payment while making all subsequent payments on time and making the June payment up by not later than September 1, 2010.[3] Debtor made partial loan payments in July and August and, on August 13, 2010, Wells Fargo gave a notice of default and acceleration.[4] It accelerated the loan on August 23. Fannie Mae filed a foreclosure petition in Sedgwick County District Court on November 1, 2010.

On January 24, 2011, the Debtor filed this case and obtained this Court's order permitting it to employ PIMCO as property manager.[5] By June, PIMCO had been fired and replaced by

---

[3] Ex. 4.

[4] Ex. 5.

[5] Dkt. 67.

-3-

Premier Real Estate Management Inc. (Premier) who found the property in terrible disarray.[6] According to Rosetta Parker, the head of Premier, conditions at the property were "bedlam." Drug dealers inhabited some of the apartments, and others had been stripped of furniture and appliances. Many tenants were not paying, as demonstrated by the property's $40,000 unpaid rent roll, and evictions ensued. The Debtor also believed that it incurred a $50,000 to $75,000 loss through the previous on-site individual property manager's embezzlement of cash rents.[7] By August of 2011, Premier had re-established some semblance of stability, but the property's occupancy was only 62 per cent. A highly credible witness, Ms. Parker thought that the property and occupancy could be stabilized in fifteen to twenty months (December 2012), but noted that net revenues would run at a deficit that, by November of 2011, would be nearly $<150,000>.[8]

Against this dreary background, the Debtor seeks to cure its defaults and reinstate Fannie Mae's loan which will mature in 2015 and require a substantial balloon payment or refinance at payoff. This implicates several issues, beginning with quantifying the default, but ultimately turning on whether the Debtor can marshal the operating capital to effect the cure, cover the $150,000 operating shortfall, and have the ability to repay the nearly $2.2 million at maturity on December 1, 2015. The parties addressed other issues at trial, but these issues matter the most.

*The Loan and the Default*

Under the terms of the Note dated November 14, 2008, the Debtor borrowed $2.4 million,

---

[6] Dkt. 115.

[7] This loss was discovered in May of 2011 and led to Premier's employment as property manager.

[8] Ross Meyeraan stated that a "stabilized" property is one with 90% occupancy for a period of 90 days.

-4-

to be repaid on a thirty-year amortization and to bear interest at 6.11 percent.[9] The loan was to mature on December 1, 2015. In the event of default, the Note would bear default interest of an additional four percentage points or 10.11 percent. The Note was secured by a first Mortgage on the property and an assignment of rents. Default interest kicked in any time a payment remained past due for thirty days or for any period of time that the matured Note remained unpaid.[10] If the lender incurred any expenses as a result of any default, the Debtor was to repay those upon demand. These expenses included attorneys fees, expert fees, and any "costs of investigation." If the Note was accelerated, the Mortgage provided for the collection "of all costs and expenses incurred" in collection efforts. The Debtor was to deposit certain replacement reserves with the lender to cover costs of repairs or improvements to the property or to assure reduction of the principal balance if occupancy or rental income was insufficient.[11] Finally, Debtor was obligated to make deposits for property taxes, and insurance.[12]

Fannie Mae calculates the extent of the default through August 31, 2011 (exclusive of

---

[9] *See* Ex. 1, Multifamily Note and Multifamily Mortgage, Assignment of Rents and Security Agreement attached to Fannie Mae's proof of claim no. 8. The Note called for monthly principal and interest payments of $14,559.38. The total monthly payment for principal and interest, taxes, insurance, and replacement reserve was approximately $21,000 according to Wells Fargo witness Twilla Revelle.

[10] *See* Note ¶ 8 at Ex. 1, p. 7.

[11] *See* Mortgage ¶ 1(b) at Ex. 1, p. 31, where the replacement reserves are described in the defined term, "collateral agreement." No separate collateral agreement was introduced into evidence at trial of this matter, but based upon Wells Fargo's Annual Statement for 2010, Debtor was paying $2,426.33 monthly to the replacement reserve until June of 2010. *See* Ex. DD.

[12] *See* Mortgage ¶ 7(a) at Ex. 1, p. 40, where such taxes and insurance obligations and deposits are termed as "impositions" and "imposition deposits."

acceleration) as follows:[13]

| | | |
|---|---:|---:|
| Pre-petition default | | $223,483.82[14] |
| Less: Partial payments | $36,728.05[15] | |
| Net Pre-petition default amount | | $201,715.77 |
| | | |
| Post-petition default | | $206,704.09[16] |
| Less: Adequate Protection | $69,977.39[17] | |
| Net Post-petition default amount | | $136,726.70 |
| | | |
| Fees and Expenses (as of 7/13/2011)[18] | | $81,360.14 |
| **Total Amount of Default to Cure** | | **$419,802.61** |

The Debtor denies that it is required to pay the default interest as a matter of law and objects to paying Fannie Mae's attorneys fees and costs. Debtor calculates the amount of the default to be cured as follows:[19]

---

[13] Ex. 2.

[14] This figure is the default amount calculated from the alleged date of default, June 1, 2010, through January of 2011 and includes default interest of $62,438.25; taxes and insurance advanced by Fannie Mae in the amounts of $20,035.77 and $17,172.24, respectively; replacement reserves in the amount of $19,410.64; and late charges of approximately $2,900. *See* Ex. 2.

[15] These three (3) partial principal and interest payments are for the period July-September, 2010 in the amounts of $10,728.06, $16,000, and $10,000, respectively. *See* Ex. 2.

[16] This figure also includes default interest in the amount of $57,453.69, calculated through August 31, 2011, taxes and insurance advanced, and replacement reserves. *See* Ex. 2.

[17] Debtor's adequate protection payments through June of 2011 were credited against the indebtedness. *See* Ex. 2.

[18] Fannie Mae's expenses include charges totaling $11,500 for an environmental site assessment, a physical needs assessment, an appraisal, and a broker's opinion of value. The balance of this line item is attributed to attorney fees, or $69,860.14. *See* Ex. 2.

[19] Ex. DD.

|  |  |  |
|---|---|---|
| Pre-petition obligations |  | $173,093.79[20] |
| Less: Amounts actually paid | $49,122.66[21] |  |
| Net Pre-petition Default amount |  | $123,971.13 |
|  |  |  |
| Post-petition obligations |  | $149,250.40[22] |
| Less: Amounts actually paid | $79,556.88 |  |
| Net Post-petition Default amount |  | $69,693.52 |
| **Total Amount of Default to Cure** |  | **$193,664.65** |

In addition, Debtor complains of the sweep and transfer of the replacement reserve account balance of some $41,323 on August 3, 2010 to Fannie Mae, but it appears that sum was later credited to Debtor's accelerated loan balance, rather than the cure amount.[23] Wells Fargo's representative Twilla Revelle testified that if Debtor effects a cure of the default, these funds would be returned to Wells Fargo for ongoing servicing of the loan.[24] The difference in the cure amounts as calculated by Fannie Mae and Debtor is $226,137.96 and is largely comprised of the disputed default interest and fees and costs.[25] The parties essentially agree on the principal and interest payments or adequate

---

[20] This figure is for the 8 month period June 2010 through January 2011 and includes regular principal and interest payments of $116,475.04, 2010 taxes in the amount of $20,035.77, 2010 insurance in the amount of $17,172.34, and replacement reserves of $19,410.64. *See* Ex. DD.

[21] This figure is comprised of $1,859.92 for tax escrow and $10,534.68 for insurance escrow. The balance consists of three partial principal and interest payments in the amounts of $10,728.06, $16,000, and $10,000 respectively. *See* Ex. DD.

[22] Like the pre-petition obligations, the post-petition obligations include principal and interest payments for the 7 month period February - August, 2011, insurance, taxes and replacement reserves.

[23] *See* Ex. 1, p. 4, Calculation of Payoff as of the date of bankruptcy filing, January 24, 2011.

[24] *See* Ex. 1, p. 7, Note ¶ 4 and p. 40-41, Mortgage ¶s 7, 8 and 9.

[25] Default interest totals $119,891.94 ($57,453.69 post-petition + $62,438.25 pre-petition) and attorney's fees and costs are $81,360.14. These two components account for $201,252.08 of the difference.

-7-

protection payments made by Debtor during the period, except that Fannie Mae's cure calculation omits a $10,693 payment made by Debtor in July of 2011.[26]

### *What the Debtor Can Raise to Effect the Cure*

Anthony Chara testified that he has been soliciting investors and funds on behalf of Debtor.[27] He believes that he can aggregate investments of $375,000 to $460,000 within the thirty days following trial to effect a cure. He testified about a list of 31 potential investors, only two of whom had committed to fund a total of $30,000 to date.[28] Ross Meyeraan says he is unable to personally contribute any more funds to the project. None of this money would be addressed to treating the looming $150,000 shortfall in operating revenue in November that Rosetta Parker testified to. This need will arise just three months after the trial. Chara testified that he was soliciting loans from individuals to cover the operating shortfall, but had received no commitments by the time of trial. Even so, the contemplated terms upon which the additional $150,000 loan is being solicited are that it will be due, with interest at a premium rate, in one year – November 2012.

The Debtor's projections attached to the disclosure statement do not provide for the repayment of the November 2012 loan, nor does it appear there will be sufficient revenue from operations to accomplish that. Indeed, Ms. Parker's budget projections do not even extend to November 2012. The Debtor's financial position is challenging at best.

---

[26] *Cf.* Ex. 2 and Ex. DD. Fannie Mae's cure calculation is dated July 14, 2011 so it may be that the $10,693 July payment had not yet been received by Fannie Mae at the time it calculated the amount necessary to cure the default. In the grand scheme of things, that payment does not make or break Debtor's ability to effect a cure of the default or substantially impact the amount of the cure.

[27] Chara's company, Apartment Mentors, LLC, holds a 10% interest in the Debtor that it received in exchange for raising capital to buy out Lew McGinnis's interest in early 2010.

[28] *See* Ex. T. Of the $30,000 committed for the cure, $10,000 was from Chara.

-8-

*Value of the Property*

The Debtor offered no evidence concerning the value of the apartments because it deemed current value to be irrelevant given that it has proposed to pay Fannie Mae in full. Fannie Mae contends that value is highly important because when the loan matures in December of 2015, Debtor will have to make a hefty balloon payment or refinance the balloon obligation. Fannie Mae presented the credible appraisal testimony of Michael DeHaas who described the property as a Class C, 116 unit apartment complex that is presently worth $1.565 million.[29] While current value may not affect the Debtor's intention to repay Fannie in full and on schedule, some understanding of current value, current loan-to-value ratios, and recent trends in value is very important for assessing the likelihood that the Debtor can refinance the payoff of nearly $2.2 million in 2015. DeHaas testified that if 80 percent occupancy could be maintained,[30] the value of the property might increase by a maximum of 3 percent a year to about $1.753 million by 2015, still well short of the anticipated balloon balance of $2.176 million. DeHaas further testified that loan-to-value ratios for properties of this type were currently in the range of 50 -75 percent, meaning that a take-out lender might only lend about $1.05 million against the apartments in 2015.[31]

*Analysis*

The Debtor bore the burden to prove by a preponderance of the evidence that its plan met all of the requirements of § 1129(a) and, if any class of debt rejected the plan, § 1129(b) as well.

---

[29] Ex. 19. DeHass indicated that Class C property is typically characterized by lower occupancy, deferred maintenance, and fewer amenities. Such property cannot command as high rental rates compared to a higher class of property.

[30] DeHass stated that for Class C property, stabilized occupancy is 80% rather than 90%.

[31] *See* Ex. 20. According to DeHaas, the lower end of the loan-to-value ratio (here 60%) would be used because of the property's above average deferred maintenance.

-9-

Fannie Mae was alone in Class 2 and it rejected the plan. The Class 3 unsecured creditors accepted the plan with one accepting ballot and no rejections.[32] Thus the requirement of § 1129(a)(1) that there be one impaired accepting class is met. The parties stipulated in the pretrial order to the Debtor having met all of the other elements of § 1129(a) except § 1129(a)(1)(compliance with title 11 and chapter 11), (a)(8)(all classes have accepted the plan), and (a)(11)(the plan will not be followed by further reorganization or liquidation--feasibility).

The Debtor argues that with the cure of its default, Fannie Mae's claim is not impaired and, therefore, it should be deemed to have accepted the plan. Were this so, all classes would have accepted the plan and the requirements of (a)(8) would be met. If not, the Debtor would be entitled to seek cram-down under § 1129(b) by demonstrating that the plan is fair and equitable as to all classes as provided in § 1129(b)(2). Only if the cure proposed by the Debtor is adequate and only if the Debtor can actually accomplish it is this argument effective. Ultimately, the Debtor failed to prove its ability to pay either cure amount, meaning that it cannot meet the requirement of § 1129(a)(8) or (a)(11).

*Sufficiency of the Cure*

Section 1124(2) provides that a class of claims is impaired unless the plan provides for a cure of the defaults to the holder of each claim in the class. How the default is to be cured is to be determined in accordance with the parties' agreement and applicable non-bankruptcy law.[33] Kansas

---

[32] Grounds Well, a lawn contractor, voted to accept the plan, but Fannie Mae objected to its claim, thereby temporarily invalidating the ballot, *see* § 1126(a). The objection is pending. Rock, Inc. accepted the plan. Its claim had been scheduled as contingent and unliquidated, invalidating its ballot. However, on August 16, 2011, the Debtor amended the schedules and removed those designations rendering Rock's an allowed claim.

[33] § 1123(d).

-10-

law and the terms of the Note and Mortgage clearly authorize the collection of default interest here. Debtor argues, however, that § 1124(2)(A)'s reference to a default "other than a default of a kind specified in § 356(b)(2) . . . or of a kind that § 365(b)(2) does not require to be cured" expressly writes default interest out of the cure amount here. Debtor bases this position on the language of § 365(b)(2)(D) that states that the cure of an executory contract or unexpired lease default does not apply to a default "that is a breach of a provision relating to . . . *the satisfaction of any penalty rate or penalty provision* relating to a default arising from any failure by the debtor to perform *nonmonetary* obligations under the executory contract or unexpired lease. . . ." Debtor argues with the support of a scant few cases that the phrase "*the satisfaction of any penalty rate or penalty provision* relating to a default" in effect creates two kinds of defaults, one relating to default or penalty interest and the other relating to penalties for nonmonetary defaults. Most courts and writers do not read this phrase in that way: rather, the majority view considers that both the "penalty rate" and the "penalty provision" language refer to and modify the words beginning with "relating to," meaning that only penalty rates that punish non-monetary default need not be cured. To hold that this provision ruled out default interest where it is otherwise legally enforceable would be to write § 1123(d) out of the Code. That section was enacted in 1994 for the specific purpose of clarifying (unfortunately in a not very clear way) that cure and reinstatement required more than simply rolling back the clock as some courts had held.[34]

Accordingly, Fannie Mae is entitled to default interest from the date of default. What that date is, however, is difficult to determine without a close reading of the Note, Forbearance

---

[34] *See In re Moody Nat. SHS Houston H, L.L.C.,* 426 B.R. 667 (Bankr. S.D. Tex. 2010); *In re General Growth Properties, Inc.,* 451 B.R. 323 (Bankr. S.D. N.Y. 2011).

-11-

Agreement and the Debtor's manager's letter requesting the forbearance.[35] Paragraph 3(a) of the Note states that monthly installments are due and payable on the "First Payment Date" and on the first day of every succeeding month thereafter.[36] The First Payment Date is defined as January 1, 2009. Paragraph 7 of the Note states that if the monthly installments are not paid by the tenth day of the month, a penalty is imposed. Paragraph 8 relates to default interest and provides that if a monthly installment is past due for thirty or more days, default interest accrues from "the earlier of the due date of the first unpaid monthly installment or other payment due, as applicable, at the Default Rate." Paragraph 12 of the Note specifies that any forbearance by the lender "shall not . . . preclude the exercise of . . . any other right or remedy." This means that even if Fannie Mae agreed to accept a late installment payment, it is not precluded from exercising any other contractual remedy it had, including the imposition of default interest.

On June 9, one day before the grace period for the June payment expired, the Debtor's property manager sent a letter to Wells Fargo requesting "to forgo the June payment," stating that the payment would be made up by "paying extra in the future months."[37] Wells Fargo's response, the forbearance agreement, provided that the Debtor would be excused from timely paying the June 2010 payment, but also that the Debtor would be required to make "Loan Payments" at no more than 30-day intervals, and that the Debtor would "return the loan to current status" by September 1.[38]

---

[35] Exhibits 1, 3, and 4.

[36] Ex. 1, p. 6.

[37] Ex. 3.

[38] Ex. 4. The forbearance agreement contemplates that Debtor was to timely make the regular monthly payments, plus such additional amounts to "make up" the missed June 2010 payment by September 1, 2010.

-12-

Nowhere in the forbearance letter did Wells Fargo or Fannie Mae agree to waive the default interest arising from the defaulted June payment. Instead, the letter made clear that the debtor was to make the installment payments every thirty days and that the June payment was to be made up by September 1, 2010.[39] The Debtor did neither. It made *partial* payments on July 7 ($10,728.05), August 12 ($16,000), and September 24 ($10,000). By Meyeraan's own admission, Debtor never made the full payment for July, August, or September. Nor did it catch up the June payment by September 1.

Fannie Mae deemed the debtor in default before September 1 and made demand on August 13.[40] An "Event of Default" is defined as Debtor's failure "to pay or deposit when due any amount required by the Note, this Instrument [Multifamily Mortgage, Assignment of Rents, and Security Agreement], or any other Loan Document."[41] Fannie Mae's demand letter asserts as a basis for acceleration the Debtor's failure to pay "certain installments due and payable under the Forbearance Agreement." The partial payment of the July principal and interest amount constitutes a further Event of Default in addition to the default that occurred when the June payment was not made. Even though the September 1 deadline for curing the June payment had not yet passed, the July

---

[39] The Loan Documents were defined to include the Note, the Mortgage and Collateral Agreement. *See* Ex. 1, p. 33 ¶ 1.(q). Payments under the Loan Documents included payments of principal and interest in the monthly amount of $14,559.38 [Note, Ex. 1, p. 6, ¶ 3(c)], "imposition deposits" for taxes and insurance (payable with the monthly principal and interest payment) [Mortgage, Ex. 1, p. 40, ¶ 7], and replacement reserves under a Collateral Agreement [Mortgage, Ex. 1, p. 31, ¶ 1.(b) and p. 41, ¶ 8].

[40] Ex. 5.

[41] Ex. 1, p. 55, ¶ 22.(a).

-13-

default supported the demand and acceleration evidenced in the August 13, 2010 letter.[42] A fair reading of the Note, the Debtor's forbearance request, and the Forbearance Agreement shows that Fannie Mae became entitled to default rate of interest when the June payment remained past due for 30 or more days and that the default rate began to accrue "from the earlier of the due date of the unpaid monthly installment or other payment due," June 1, 2010.[43]

The language of the loan documents allows Fannie Mae to demand reimbursement for its fees and expenses caused by the default and its efforts to collect the Note. It is neither unusual nor unexpected for a lender to seek an appraisal and an environmental report as part of resolving a default either by workout or collection. These are routine costs that should come as no surprise to a borrower sophisticated enough to apply for and receive a $2.4 million commercial real estate loan. Likewise that a borrower should be called upon to pay attorneys fees is hardly shocking. For the purpose of this Order only, those fees are allowed at $69,860.14.[44] In sum, the amount necessary to cure Debtor's default is $419,802.61, as modified to re-calculate default interest through August

---

[42] *See* Ex. 1, p. 7, Note ¶ 6 which provides that upon an Event of Default, the Lender may accelerate the indebtedness without prior notice to Borrower and "regardless of any prior forbearance."

[43] *See* Ex. 1, p. 7, Note ¶ 8.

[44] As noted in footnote 18, the total attorney fees and expenses through July 13, 2011as shown on Fannie Mae's cure calculation (Ex. 2) is $81,360 with the $69,860 figure attributable solely to attorney fees. In Fannie Mae's submission of August 15, 2011 filed shortly before trial, it claims attorney fees and expenses of $87,525.44 through August 10, 2011. *See* Dkt. 150. It then filed an updated statement of fees and expenses for an additional amount of $34,749.20 for the period August 11-23, 2011 in preparation for the confirmation hearing. *See* Dkt. 169. This brings the total attorney fees and expenses through August 23, 2011 to $122,274.64. The Court makes no determination of the reasonableness of the fees and expenses herein. For purposes of determining the amount of the cure, the $81,360 figure of attorney fees and expenses is considered. Given the Debtor's inability to come close to effecting a cure of the $420,000 amount (inclusive of the $81,360 for attorney fees and expenses), it is unnecessary to consider the revised and updated figures for attorney fees and expenses.

Case 11-10131   Doc# 187   Filed 10/05/11   Page 14 of 16

31, 2011.

*Feasibility*

Nothing presented by the Debtor suggested that it has or will shortly have the capacity to pay the cure amount calculated above. Indeed, it does not appear that the Debtor can pay even the cure amount it advocates. The debtor had less than $1,000 cash on hand according to its most recent monthly report. And the cure is not Debtor's only problem: there is the looming $150,000 operating shortfall projected by Rosetta Parker. The Debtor intends to borrow $150,000 to cover that shortfall, but the loans contemplated will be payable in November of 2012 and there is no reason to believe that the Debtor will have the means to pay them (if it gets the loans at all).

To fund the cure and shortfall, the Debtor proposes to raise money from new investors or borrow or both. Raising money from new investors is problematic for two reasons. First, the Debtor did not show that more than two investors were committed to funding the cure and those two investors, one of whom was Chara's company, have only committed to the meager sum of $30,000. The Debtor has prepared an offering circular, but even that document remains in draft form and both Chara and Meyeraan said that the solicitation process remained in flux. Second, the contemplated sale of additional interests in Ashbury might result in a change of control of the company or a change of control in its principal owner, RTD. Done without Fannie Mae's permission, such a dilution is a further event of default under the loan documents. Indeed, it appears that there have been transfers among the Key Principals already that changed the holdings in RTD in a way that may violate the loan documents. Thus, raising the money to cure the monetary default may result in a critical nonmonetary default.

Worse yet, the Debtor failed to show that it would be able to refinance the 2015 balloon

-15-

payment that will exceed $2.176 million. The property, which is highly distressed, is currently worth $1.565 million. Current LTV ratios for properties like this one are 60 percent. In order to get a 60 percent LTV loan for $2.176 million, Siena Court would have to appraise at $3.627 million, more than double its current value. The Debtor offered no evidence that would support even a hope of that occurring in four years, particularly in the current economic environment. Hope is not a plan; even if it were, there is little hope to be found in this case.

*Conclusion*

The cure proposed by the Debtor is insufficient as a matter of law. But whether the Debtor or Fannie Mae is right about the amount of the cure, the Debtor lacks the current resources to pay the cure in any amount. And, even if it could cure the default, its prospects for covering the November shortfall and refinancing the balloon are bleak at best. The Debtor failed to show that it could cure the default on Fannie Mae's debt or that its efforts will not be followed shortly by additional reorganization or liquidation. Because the Debtor fails to cure under the provisions of § 1123(d), Fannie Mae remains impaired. The plan is unfeasible and fails to meet the requirements of 1129(a)(11). Confirmation is therefore DENIED.

The Debtor shall have 21 days to amend its chapter 11 plan or move to convert this case to chapter 7. If it does neither, the case will be dismissed on the 22nd day after the entry of this Order.[45]

IT IS SO ORDERED.

# # #

---

[45] Dismissal would moot Fannie Mae's stay relief motion, dkt.70. If the plan is amended or the case is converted, the Clerk will set the motion for a prompt evidentiary hearing.

-16-

Case 11-10131   Doc# 187   Filed 10/05/11   Page 16 of 16